UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    v.<br><br>SUNI MUNSHANI and<br>SURESH MUNSHANI,<br><br>                    Defendants. | No. 22-cr-00215-JSR |

**DEFENDANT SURESH MUNSHANI'S MEMORANDUM IN SUPPORT OF
<u>MOTION TO DISMISS COUNT I AS DUPLICITOUS</u>**

         **GUSRAE KAPLAN NUSBAUM PLLC**

         Martin H. Kaplan
         Kari Parks
         120 Wall Street, 25th Floor
         New York, New York 10005
         (212) 269-1400
         (212) 809-5449
         mkaplan@gusraekaplan.com
         kparks@gusraekaplan.com

         *Counsel for Defendant Suresh Munshani*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................................... ii

FACTUAL BACKGROUND .......................................................................................................... 1

    I.    The Government Alleges Three Separate Wire Fraud Conspiracy Counts Against Suresh's Brother Suni, the Victim Company's Former CEO ........................................... 1

    II.    The Single Count Against Suresh is the Only Count In Which the Government Alleges Multiple "Schemes" ............................................................................................. 3

        A.    Count I Pleads Both a "Tax Liability Scheme" that Began and Ended in 2015 and a "Fraudulent Contractor Scheme" that Began in 2011 and Ended in 2018 ........ 3

        B.    Counts II and III Each Allege Separate Schemes in Which Suni Tricked Protegrity Into Contracting with Fake Companies that Suni, Himself, Owned ........ 4

LEGAL STANDARD ..................................................................................................................... 6

ARGUMENT ................................................................................................................................... 7

    I.    Unlike Counts II and III, Count I Collapses a Time-Barred $3.5 Million "Tax Fraud Scheme" into a Facially-Valid $30,000 "Fraudulent Contractor Scheme" ........... 7

    II.    By Bootstrapping in a Time-Barred Scheme to Steal Over 116 Times More Money—and Triggering an Exponentially-Higher Guidelines Sentence—Count I's Duplicity Prejudices Suresh ........................................................................................... 10

CONCLUSION ............................................................................................................................. 11

## TABLE OF AUTHORITIES

### CASES

United States v. Greenberg, No. 21-CR-92 (AJN), 2022 WL 827304 (S.D.N.Y. Mar. 9, 2022) (Nathan, J.) .................................................................................................. 6, 7
United States v. Ralston, No. 19-cr-774 (JSR), 2022 WL 769257 (S.D.N.Y. Mar. 14, 2022) (Rakoff, J.) ...................................................................................................... 6, 10
United States v. Sturdivant, 244 F.3d 71 (2d Cir. 2001) ............................................ 6, 10
United States v. Tutino, 883 F.2d 1125 (2d Cir. 1989) .................................................... 7
United States v. Vilar, 729 F.3d 62 (2d Cir. 2013) ..................................................... 6, 7

### STATUTES

18 U.S.C. § 3282(a) ............................................................................................................ 10

### RULES

Fed. R. Crim P. 12(b)(3)(B)(i) ............................................................................................. 6
Fed. R. Crim. P. 12(b)(2) .................................................................................................... 6

Defendant "**Suresh**" Munshani respectfully submits this memorandum in support of his Rule 11 "**Motion**" for partial dismissal of the single count against him, which duplicitously alleges a separate, time-barred conspiracy that would subject him to a 14-level Guidelines increase instead of a four-level increase.

### FACTUAL BACKGROUND

I.  **The Government Alleges Three Separate Wire Fraud Conspiracy Counts Against Suresh's Brother Suni, the Victim Company's Former CEO**

On April 11, 2022, the Government filed the Sealed "**Indictment**" in this case; it was unsealed on April 13, 2022. See Dkt. 1 (Apr. 11, 2022); Dkt. (April 13, 2022).

The Indictment alleges three counts, which the Government titles:

1. "Conspiracy to Commit Wire Fraud: Fraudulent Contractor and Fake Tax Liability Scheme" ("**Count I**");
2. "Conspiracy to Commit Wire Fraud: Development Company Scheme" ("**Count II**");
3. "Conspiracy to Commit Wire Fraud: Licensing / Reseller Scheme" ("**Count III**").

Indictment at 1, 8, 13.

The Indictment alleges all three counts against "**Suni**" Munshani, who was Chief Executive Officer ("**CEO**") of the "Victim Company," "**Protegrity**" USA Inc., from May 2011 through October 2019. Indictment ¶ 2. Suni is Suresh's brother. Id. ¶ 3.

The Government's 44-paragraph Indictment focuses almost entirely on Suni, and alleges only Count I against Suresh. See generally id.

1

The Government's only specific allegations of Suresh's supposed wrongdoing are:

- "**SUNI MUNSHANI CAUSES FRAUDULENT PAYMENTS TO INDIVIDUAL-1** [ . . . b]etween in or about March 2015 and in or about September 2018, Suni Munshani[] caused [Protegrity] to issue at least four checks to the Individual-1 Company that were deposited into a bank account opened and controlled by Suresh," who "added the name of the Individual-1 Company to the bank account," id. ¶ 9;
- "For each of the four checks [ . . . ] Suresh[] transferred most of the funds to an account controlled by Suni[] and kept a portion of the proceeds for himself. For example, in or about fall 2018, Suresh[] transferred $24,000 for the benefit of Suni[], and retained $6,000 of a $30,000 check," id. ¶ 10;
- "**SUNI MUNSHANI EMBEZZZLES PURPORTED $3.5 MILLION TAX PAYMENT** [ . . . ] Suni[], with the assistance of Suresh[], stole an additional $3.5 million from [Protegrity]," by "claim[ing] that [Protegrity] had a $3.5 million tax liability and signed a handwritten check from [Protegrity] to the [IRS] for that amount," id. ¶ 11;
- "On or about August 24, 2015, Suni[] transferred $300,000" to the above-mentioned Suresh account, and the next day, that account "wired approximately $274,990 to a bank account controlled by Suni," id. ¶ 14(a).

The Indictment makes no allegations regarding Suresh's knowledge or intent. See generally id.

2

**II.   The Single Count Against Suresh is the Only Count In Which the Government Alleges Multiple "Schemes"**

**A. Count I Pleads Both a "Tax Liability Scheme" that Began and Ended in 2015 and a "Fraudulent Contractor Scheme" that Began in 2011 and Ended in 2018**

Count I is the only alleged "conspiracy" that involves two separate "schemes," which the Government titles the "Fraudulent Contractor Scheme" and the "Fake Tax Liability Scheme." See id. ¶¶ 1–16.

To plead the "Fake Tax Liability Scheme," the Government alleges that in May 2015, Suni claimed that Protegrity had a $3.5 million tax liability but used that $3.5 million just to pay himself. Id. ¶¶ 11–12. The Government alleges only one act that Suresh committed in connection with this theft: an account controlled by Suresh accepted a transfer of $300,000 of that $3.5 million, and wired $274,990 out to an account controlled by Suni. Id. ¶ 14(a).

In explaining what it dubbed the "Fraudulent Contractor Scheme," the Government pleads that Defendants "carried out a scheme to defraud [Protegrity] of millions of dollars through fraudulent agreements with and money transfers to a purported third-party contractor ('Individual-1') and a company purportedly controlled by that third-party (the 'Individual-1 Company'), but actually controlled by [D]efendants." Id. ¶ 3. The Government alleges that Suni first set up this plan in 2011 — yet the only wrongful checks were issued between March 2015 and September 2018. Id. ¶¶ 8–9. Suresh's only supposed conduct in connection with that "Fraudulent Contract Scheme" is transferring "four checks" for which he "kept a portion of proceeds for

3

himself;" the only specific transaction alleged, however, is one September 2018 transaction, in which Suresh "retained $6,000 of a $30,000 check." Id. ¶ 10. The Government does not allege whether the Fraudulent Contractor Scheme involved payments beyond this $30,000 check.

The Indictment does not explain why the "Fraudulent Contractor Scheme" is the same conspiracy as the "Fake Tax Liability Scheme." See generally id.

### B. Counts II and III Each Allege Separate Schemes in Which Suni Tricked Protegrity Into Contracting with Fake Companies that Suni, Himself, Owned

Unlike with Count I, Counts II and III each focus on one overarching plan. See id. ¶¶ 17–44.

Count II, the "Development Company Scheme," alleges that Suni and "others known and unknown"—but not Suresh—"carried out a scheme to defraud [Protegrity] of millions of dollars through services agreements between [Protegrity] and a software development company (the '**Development Company**')" in which Suni had "an undisclosed ownership interest." Id. ¶ 18. The Government alleges that Protegrity and the

Count II's "Development Company Scheme" alleges that Protegrity and the Development Company began negotiating "a potential contractual relationship" in February 2013; Protegrity eventually executed contracts with the Development Company; Protegrity paid the Development Company approximately $4.1 million pursuant to those contracts through 2019; and Suni took approximately $2 million of those payments for himself. Id. ¶¶ 17–27.

4

Finally, Count III's "Licensing / Reseller Scheme" claims that from December 2018 through October 2020, Suni "and others known and unknown[] carried out a scheme to defraud [Protegrity] through licensing and reseller agreements between [Protegrity] and two other companies," and that Suni, himself, had "conspired with others to create the two companies and assist the companies in their negotiations with [Protegrity]." Id. ¶ 29. As in the Development Company Scheme, Suni created email accounts that belonged to people who did not exist, for a company that Suni himself had created, in order to disguise his own relationship with the supposed contractor, use his position as Protegrity's CEO to make Protegrity contract with that company, and line his own pockets. See id. ¶¶ 31–39. The Government alleges that Suni personally received at least $200,000 from Count III's Scheme. Id. ¶ 40.

## LEGAL STANDARD

"The Court has authority to consider and grant a motion to dismiss at the pretrial stage, including on a defense 'that the court can determine without a trial of the general issue.'" United States v. Ralston, No. 19-cr-774 (JSR), 2022 WL 769257, at *6 (S.D.N.Y. Mar. 14, 2022) (Rakoff, J.) (quoting Fed. R. Crim. P. 12(b)(2)); see also Fed. R. Crim P. 12(b)(3)(B)(i) (court may dismiss an indictment as duplicitous).

The Court should dismiss an indictment as duplicitous if it (1) combines two or more distinct crimes in one count in contravention of Rule 8(a) and (2) thereby prejudices the defendant. Ralston, 2022 WL 769257, at *7 (citing United States v. Vilar, 729 F.3d 62, 79 (2d Cir. 2013); United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001)). In deciding whether an indictment is fatally duplicitous, the Court should consider only the indictment "on its face." United States v. Greenberg, No. 21-CR-92 (AJN), 2022 WL 827304, at *11 (S.D.N.Y. Mar. 9, 2022) (Nathan, J.).

**ARGUMENT**

Because the only cause of action against Suresh collapses a time-barred $3.5 million conspiracy with a separate, $30,000 conspiracy, the Court should dismiss Count I as duplicitous. In the alternative, Suresh respectfully requests that the Court dismiss the "Tax Fraud Scheme" allegations from the Indictment or order a Bill of Particulars that explains why the "Fraudulent Contractor" and "Tax Fraud" schemes should be considered a single scheme, as is necessary to be lumped into the same conspiracy count.

**I.     Unlike Counts II and III, Count I Collapses a Time-Barred $3.5 Million "Tax Fraud Scheme" into a Facially-Valid $30,000 "Fraudulent Contractor Scheme"**

Because "a single agreement may encompass multiple illegal objects," "a single count of a conspiracy to commit several crimes is not [inherently] duplicitous." Greenberg, 2022 WL 827304, at *10 ("[C]onspiracy is the crime and that is one [crime], however diverse its objects").

However, an Indictment cannot collapse multiple acts into a single conspiracy count unless "the essence of the alleged crime is carrying out a single scheme to defraud." Id. (quoting Vilar, 729 F.3d at 79; United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989)).

But here, the Government does exactly that: Count I encompasses two separate schemes to defraud. On the Indictment's face, the only similarity between Count I's "Fraudulent Contractor" and "Tax Fraud" schemes is that Suresh allegedly helped Suni collect Protegrity's money and kept a portion of those funds for himself. See id. ¶¶ 5–14.

7

But that **method** of committing fraud, standing alone, falls far short of alleging a "**single** scheme to defraud."

The "Tax Fraud" Scheme began in May 2015, when Suni cause Protegrity to issue a $3.5 million check for non-existent federal tax liability, and ended in September 2015, when Protegrity transferred $3 million of that money to one of Suni's personal bank accounts. Indictment ¶¶ 12, 14(b). Suresh's only alleged involvement in that finite conspiracy occurred on August 24 and 25, 2015, when (1) an account alleged controlled by Suresh accepted $300,000 from Protegrity, and then (2) wired out approximately $274,990 to Suni, leaving just $25,010 in Suresh's supposed account. Id. ¶ 14(a).

The "Fraudulent Contractor" Scheme, meanwhile, involves completely separate allegations—and allegations that much more closely mirror Counts II and III's schemes. See generally id. ¶¶ 5–10. In connection with the Fraudulent Contractor Scheme, the Government alleges that Suni planned and executed a fraud (1) using email accounts created by Suni for people who did not exist, in order to dupe Protegrity into (2) contracting with a company that Suni, himself, owned, and that (3) the outside company did not actually provide the services for which Protegrity had contracted. Id. ¶¶ 5–7.

The temporal differences between Count I's schemes further suggests that they truly are separate schemes. The Tax Scheme lasted just four months. Id. ¶¶ 11–14. In May 2015, Suni claimed that Protegrity owed the IRS $3.5 million; that same month, he signed a check from Protegrity to the IRS for that same amount; "around the same time," Suni caused Protegrity to issue another $3.5 million check; that same day, Sunil

8

opened a new bank account and deposited the second check into that new account; in August 2015, Suni transferred $300,000 to Suresh, who wired $274,990 back to Suni; and two weeks later, the other $3 million was transferred from a Protegrity account to Suni. Id. ¶ 14.

However, the Fraudulent Contractor Scheme lasted seven years. Id. ¶¶ 5–10. It supposedly began with negotiating contracts in October 2011; continued with executing a specific contract in October 2014; further continued with issuing payments pursuant to that contract from March 2015 through September 2018; and concluded in September 2018, when Suresh allegedly received the $30,000 check and kept $6,000 for himself. Id.

Moreover, the Fraudulent Contractor Scheme also is much more temporally related to Counts II and III than it is to Count I: while the Government claims that Suni set Fraudulent Contractor scheme into motion in 2011, the only fraudulent payment specifically alleged occurred in "fall 2018," when Suresh "transferred $24,000 for the benefit of Suni[], and retained $6,000 of a $30,000 check" for himself. Id. ¶ 10.

In short, Count I's "Tax Fraud" Scheme and "Fraudulent Contractor" Scheme have such different facts, methods, (unidentified) conspirators, and time periods that it simply makes no sense to construe them as a "single scheme to defraud." Indeed, the two Schemes' methods, goals, and tricks are so different that the Government did not even attempt to give them the same name, and indeed grouped each scheme's underlying allegations into their own sections, under their own headers. See id.

And while the Government's decision to separately charge Counts II and III does not, in and of itself, render Count I duplicitous, it should make us ask: Why combine

the Fraudulent Contractor Scheme with the Tax Fraud Scheme when it has so much more in common with Counts II and III's "Development Company" and "Licensing / Reseller" Schemes?

**II.    By Bootstrapping in a Time-Barred Scheme to Steal Over 116 Times More Money—and Triggering an Exponentially-Higher Guidelines Sentence—Count I's Duplicity Prejudices Suresh**

Each of the Government's three Counts is subject to a five-year statute of limitations. See 18 U.S.C. § 3282(a). While the Fraudulent Contractor, Development Company, and Licensing / Reseller Schemes all are timely, the Tax Fraud Scheme—which began and ended in 2015—is not.

The amount of loss drives wire fraud conspiracy sentencing: while the Fraudulent Contractor Scheme's alleged $30,000 loss would subject Suresh to a four-level increase, the Tax Fraud Scheme's $3.5 million loss would subject him to a 14-level increase. See USSG § 2B1.1(b).

Because wire fraud conspiracy's base offense level is 7, at bare minimum—factoring in Suresh's complete lack of criminal history, and assuming there are no aggravating factors—including the time-barred Tax Fraud Scheme in Count I would elevate Suresh's Guidelines sentence from 8–14 months to 37–46 months.

There can no doubt that four extra years in prison comprises exactly the type of prejudice that warrants dismissing Count I as duplicitous. Accord Ralston, 2022 WL 769257, at *7 (citing Sturdivant, 244 F.3d at 77–78) ("A duplicitous indictment may prejudice the defendant if there is a possibility that the defendant lacks notice of the charged crime and its maximum penalty, a second trial may not be bared by the Double

10

Jeopardy clause, or there is potential uncertainty with respect to the crime of which the jury convicted the defendant and the attendant sentencing implications.").

## CONCLUSION

This is the rare case in which duplicity is evident from the face of the Indictment: the Government's own allegations, including its organization of Count I into two different "Schemes" without any attempt to explain how the two are connected to each other, make clear that the Tax Fraud and Fraudulent Contractor simply do not comprise a "single scheme."

While that, standing alone, typically would not actually prejudice Suresh—after all, the Indictment charges two other counts and schemes that are strikingly similar to the Fraudulent Contractor Scheme—here, allowing the Government to bootstrap Tax Fraud Scheme would force Suresh to force a time-barred charge that involves **over one hundred and sixteen times the loss alleged in the timely Scheme**, and would subject him to an exponentially-longer Guidelines sentence.

Therefore, Suresh respectfully requests that the Court dismiss Count I against him—the only count against him. In the alternative, Suresh respectfully requests that the Court strike the Tax Fraud Scheme from the Indictment, or order a Bill of Particulars explaining how the Tax Fraud Scheme is not time-barred.

Dated: August 1, 2022
      New York, New York

                Respectfully submitted,

                **GUSRAE KAPLAN NUSBAUM PLLC**

                /s/ Martin H. Kaplan
                Martin H. Kaplan
                Kari Parks
                120 Wall Street, 25th Floor
                New York, New York 10005
                (212) 269-1400
                mkaplan@gusraekaplan.com
                kparks@gusraekaplan.com

                *Counsel for Defendant Suresh Munshani*